UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(Eastern Division)

| | |
|---|---|
| JENNY RUBIN, et al. ) | |
| Plaintiff, ) | |
| ) | Case No.: 03-CV-9370 |
| ) | Judge Blanche M. Manning |
| THE ISLAMIC REPUBLIC OF IRAN, et al. ) | |
| ) | |
| Defendants ) | |

**MOTIONS OF CITATION RESPONDENTS, THE UNIVERSITY
OF CHICAGO AND THE ORIENTAL INSTITUTE, FOR PROTECTIVE
ORDER AND FOR RULE 16 CONFERENCE AND ORDER**

Now come The University of Chicago and its division, The Oriental Institute, and in support of their Motions for Protective Order and For a Rule 16 Conference and Order streamlining and prioritizing issues and discovery in these proceedings, state as follows:

1. The Oriental Institute is the leading center in the United States for the study of the archeological and textual record of the development of civilizations in the Ancient Near East. It is a part of the University of Chicago, and has been known for its scholarly research since its origin in 1919.

2. The Oriental Institute is a uniquely interdisciplinary environment in which scholars collaborate on archaeology, language, history, anthropology, and the development of civilizations, as those subjects relate to the Ancient Near East, which includes North Africa, Egypt, Israel, Lebanon, Turkey, Syria, Jordan, and, Mesopotamia and Persia (now known as Iraq and Iran).

**THE PERSIAN COLLECTIONS AND THE PRESERVATION OF THE STATUS QUO**

3. The Institute and University are respondents to citations in these proceedings because they possess – solely for scholarly study – two collections of ancient Persian seals and

cuneiform writings found on clay tablets and tablet fragments, which were recovered in excavations in Iran in the 1930's and 1960's. (Tindel Aff. at ¶ 2; Stolper Aff. at ¶ 2.) The judgment creditors seek to levy their judgment against these objects of scholarly research, which are federally exempt from levy as non-commercial property under the Foreign Sovereign Immunities Act, and are subject to the Institute's superseding possessory right to continued study of them, prior to any reversionary interest of the National Museum of Iran and the Iranian Cultural Heritage Organization in the tablets.

**THE RESEARCH MATERIALS AT ISSUE**

4. As recited in the attached affidavits of the personally responsible custodians, there are only two Persian collections in which any Iranian person or entity is believed to have any interest. (Stolper Aff. ¶ 3.) They are secure at the Institute, and there is no intention for any transfer of either collection without court approval, while these proceedings are pending. The University, as reflected in the affidavits, and *as clearly stated by this motion*, denies any intention whatsoever to transfer in the near future, *and specifically represents that it will not transfer the two Persian collections, without court approval, while these supplemental proceedings are pending.* ( Stolper Aff. ¶ 11; Tindel Aff. ¶ 7.)

5. The two collections have irreproducible informational value as insights into life in Persia, and particularly administrative behavior during the reign of Darius I (500 B.C), before Persia's conquest by Alexander the Great. There is no comparable information anywhere in the world about the administrative behavior of ancient civilizations at that time, including a complete lack of any comparable materials for similar behavior of the Romans or Greeks. These texts feed the research of linguists, historians, artists, archaeologists, and anthropologists, and have been under continuous study by such persons at the Institute for over seventy years. ( Stolper Aff.

¶¶ 7-13; Tindel Aff. ¶ 5.) The collections are known as the Chogha Mish materials and the Persepolis Fortification Texts.

**NON-COMMERCIAL NATURE OF THE COLLECTIONS**

6. The collections were not obtained for and are not held for the derivation of any revenues or the generation of any profit. No admission is charged for entry into the Oriental Institute Museum, and all the work of the Oriental Institute relating to the two collections has been for scholarly, and not commercial, purposes. ( Stolper Aff. ¶ 16; Tindel Aff. ¶ 8.)

**FRAGILE NATURE AND NONEXISTENCE OF SPECIFIC INVENTORY**

7. These Persepolis "texts" and Chogha Mish seals are not documents in any modern sense. They are cuneiform writings, meaning that the characters were impressed into the moist clay with a stylus into very small bits of wet clay, each of which was then hardened in the open air, over two thousand years ago. On average, the pieces are not the size connoted by the word "tablet." They are in fact only a few inches in length or diameter, with very few pieces that are as large as a human hand. A large percentage of the items *are as small as a fingertip*, with tiny bits of writing discernible on their very small surfaces. They are not stone, they have not been "fire-hardened," and they have no stone-like durability. By definition, they are merely air-hardened dirt and clay, most of which, if mishandled, or handled excessively, will not cleave, but could instead be crumbled and reduced to dust and dirt, with all the writing irretrievably lost forever. ( Stolper Aff. ¶¶ 4-7.)

8. The pieces in the collection are not individually numbered and most are not individually boxed. Most are contained in groups in cigar-box-sized containers, often with many fragments in a single box. Shaking or carelessly moving a box with a dozen such pieces in it inherently would result in friction among the pieces, with potential loss of their writings or of the entire piece. ( Stolper Aff. ¶¶ 4, 14.)

9. There is no comprehensive numbering system or specific inventory that covers the materials, although there is a good list for the Chogha Mish materials, and many different subparts of the collections have been subjected to different attempts at labeling or numbering over the last seventy years, often involving no more than the affixing of fragile pieces of paper, by rubber bands, to individual bits of clay, to identify them as related parts of some larger subject under review for a particular research scholar. Any attempt to create and implement a single or comprehensive numbering system for the collection has been estimated, by those who work with the collections and are familiar with the preservation and handling of antiquities, as likely to take months, if not years, of extensive and expensive work conduct by multiple, experienced research fellows. More fundamentally, that exercise would be likely to jeopardize the collection itself by excessive handling of these two thousand year-old dried pieces of clay. (Stolper Aff. ¶¶ 12, 14; Tindel Aff. ¶¶ 5-7.)

10. The scholars have no confusion about the universe of the two collections, despite the lack of a highly specific inventory. They are broadly defined by two names and separately secured, even if they are not well numbered. The Chogha Mish Collection is separately housed under the careful supervision of the Institute's Registrar and Senior Curator in the Institute's Museum Secure Storage (awaiting disposition instructions from the U.S. State Department, as explained below in ¶ 16). (Tindel Aff. ¶¶ 5-7.) The Persepolis Fortification Texts Collection is housed in an extensive array of segregated boxes, shelves, and drawers, which are *all within the secure office of affiant* Professor Matthew Stolper, whose office is double locked within the fully alarmed and heavily secured Institute building. (Stolper Aff. ¶¶ 13-5.) Each custodian of the two collections has attached an affidavit regarding the absence of future transfer without court

approval and regarding the identifiable nature of the collections and the security that surrounds them. (Stolper Aff. ¶ 11; Tindel Aff. ¶ 7.)

11. Given the absence of justifiable concerns about the University's security, the absence of any desire on the part of the University to dissipate these important collections, the intense interest of the University in preserving the scholarly use of the material, the damage that could come to the collections from mishandling or excessive movement, the normal security already provided by the mere existence of the pending citations, and the representations by the affiants and by the University that no transfer will be made without court approval while these proceedings are pending, there is little reason to conduct hearings or discovery directed at an already irrefutable record of adequate identification and preservation. On this record, where the collections are secure and the exemption issue is raised by their very definition, the typical concerns about a complicit third party aiding a judgment debtor's improper transfer or sheltering of assets, should be subordinated to efficient treatment of the substantive legal issues that may render the citations wholly inappropriate.

**PRIORITIZATION UNDER ILLINOIS RULE 277 AND FEDERAL RULE 16**

12. Judgment Creditors have a right to a hearing which this court may schedule and conduct as the Court deems appropriate. Such hearings are sometimes obviated by information sought or obtained through other mechanisms or in other sequences as in the case of the affidavits provided herein. The Court is expressly granted discretion at any time to suspend or "terminate" any deposition or hearing, "and otherwise control or direct the proceeding" to the end that all "right and interests of all parties and persons involved be protected and harassment avoided." Ill. Sup. Ct. Rule 277(e). The governing Illinois statute (735 ILCS 5/2-1402) expressly provides that exemption issues are to be prioritized, directing that the "court shall immediately, unless for good cause shown . . . proceed to determine whether the property"

declared to be exempt really is exempt. 2-1402(l). Under 2-1402(m), the restraining provisions that normally limit transfer simply do not apply to exempt property, but the University has agreed to refrain from any transfer without court approval pending orderly briefing and resolution of the exemption issue. Even without the Supreme Court Rule 277 and 2-1402 proceedings, which are incorporated by Federal Rule of Civil Procedure 69, Federal Rule of Civil Procedure 16 also empowers the Court to modify the focus or sequence of any part of its proceedings to streamline them and get directly to a controlling issue, which here is whether the property is exempt. Having adequately secured and defined the collections in question, which on their face bespeak exemption and non-commercial use, the continuing fight over discovery sequence and contempt claims is a harassing expense to a research institution and a potential jeopardy to the materials in its care. Discovery of the kind normally given on the short notice of a Citation has been provided and is largely unnecessary in a case that is really about the exemption and not about how the property is numbered or what it is worth. Respondents respectfully request that this court set a reasonable schedule to brief the exemption and immunity related arguments, all of which have the potential to render *all other proposed discovery* irrelevant, a waste of time, and a potential damage to the collections. No prejudice will come to the collections or to any legitimate right creditors claim to have in them, if an orderly argument is scheduled and the collections remain securely held where they are.

13. There is strong reason to immediately prioritize the main substantive issues that will govern these supplemental proceedings, and to streamline the treatment of those issues, which center on the exempt status of the property. Those issues should and will be treated in much greater detail in papers and evidence that the University proposes to submit on an orderly briefing schedule. The Rule 16 portion of this motion asks for orderly, prioritized briefing of the

Respondents' arguments that: (a) the collections are exempt property under the Foreign Sovereign Immunities Act because they are not subjected to commercial use; and (b) the collections are otherwise immune from levy predominantly because of the possessory and scholarly superseding interest the Oriental Institute holds in them.

**THE PROPERTY IS IMMUNE FROM ATTACHMENT OR EXECUTION**

14. More specifically, by federal law, no post judgment citation can apply to exempt assets. All assets of a foreign sovereign are presumptively immune from attachment unless petitioners can show that such assets fall under one of the exceptions to immunity created by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601-1610. Petitions have not yet made any such showing, and cannot. The collections, which are not subjected to commercial use and are quintessentially property held for scholarly, non-commercial purposes, are statutorily exempt from levy.

**IN ANY EVENT, ANY IRANIAN RIGHT TO THE ARTIFACTS ARE SUBJECT TO THE INSTITUTE'S PRIOR POSSESSORY RIGHTS**

15. The Persepolis Texts, although they are held in trust by the Institute as property in which the National Museum of Iran and the Iranian Cultural Heritage Organization have a reversionary expectation, are subject to a superseding possessory property interest of the Institute, reflected by its right to study the materials before any return to Iran. That interest is effectively of undetermined duration, varying with the particular objects, and measured by the study interests and needs of the Institute. The Institute and the National Museum of Iran have recognized that such study can take decades, as it has in respect of the portions of the collections that have been previously returned. The last part of the collection that was returned to Iran earlier this year was held by the Institute for some 70 years of such study, before return to Iran. The National Museum of Iran has only a reversionary interest (i.e., a right to ultimate ownership

and return), in the Persepolis Texts which is preceded by a lengthy and important possessory interest of the Oriental Institute (i.e., the Institute's right and obligation to hold for scholarly study). Such property should be immune from levy, as a matter of sound property law as well as sovereign immunity jurisprudence.

**THE STATE DEPARTMENT'S INTEREST**

16. The other collection – the Chogha Mish material – was already the subject of a litigated dispute before the Iran-United States Claims Tribunal. (Tindel Aff. ¶ 6.) The U.S. State Department advised the University that as a result of that case, the Chogha Mish collection is to be returned to Iran at some future date by the State Department, and has expressed orally its expectation that the University will hold that collection for that purpose, until further instructed by the State Department. That collection is secured, *and is now further subject to the University's promise not to transfer it without a court order during these proceedings.* (Tindel Aff. ¶ 6.) Attempts to ascertain the status of the State Department's intentions for the Chogha Mish material over the last several days have been inconclusive.

17. Sound judicial discretion can and should protect a non-profit, non-commercial, scholarly research institute from the harassment of discovery time, expense, and diversions, when the core issues so facially and immediately suggest exemption, when the security of the property is free from dispute, and when state law prioritizes the resolution of exemption claims.

18. Judgment Creditors have insisted on compliance with their demands for particular exercises, in a particular sequence, including obvious attempts to use the shortened time for a citation to also obtain interrogatory answers and documents on a less than normal schedule. Deposition testimony was first extended by agreement and then reneged upon by the creditors alleging insecurity, in an apparent attempt to manufacture a contempt claim. Creditors twice rejected proposals offered by respondents to orderly address creditors' security concerns and to

schedule the unavoidable briefing on exemption. Contrary to the expectations of local rules, creditors most recently declined to submit any responsive mark-up to a proposed agreed order (which respondents offered last Friday) to schedule proceedings in this matter in an orderly and efficient manner. Instead, in a Sunday email, creditors predicted an ultimate lack of agreement and demanded a telephone response from respondents on Monday. When respondents twice called on Monday, creditors were then unavailable for the call they had demanded, and chose never to return the call, serving instead their trumped-up contempt motion, which literally *anticipates* a contempt for Thursday, June 17, before that date arrived.

19. Respondents respectfully propose to file their full motion on the substantive exemption issue, with supporting affidavits or other materials, within sixty days, and ask that this Court schedule appropriate response and reply timing on that issue to allow proper treatment of the substantive issues that are significant not only to Foreign Sovereign Immunities jurisprudence, but also to the academic and arts communities at large. Respondents ask this court to issue its order denying creditors the written discovery they have attempted to conduct on short notice by inserting interrogatories and document requests into the citations, and limit discovery to the exemption issue, once it is framed by respondents' full motion. Respondents suggest that a status hearing be held in seventy days, ten days after the proposed date for respondents' substantive law filing, and that decision be deferred until then on what if any depositions are needed after the main motion and supporting papers are filed. Respondents further request an order striking or deferring Creditors' overstated motions for contempt.

WHEREFORE, Respondents pray for this Court's order

1) setting a status hearing in 70 days.

2) granting respondents 60 days within which to brief and submit affidavits or other material supporting their legal claims as to the impropriety of levy on these assets.

3) deferring any decision on what further testimony, if any, may be necessary or required, by deposition or otherwise, until the status hearing;

4) deferring the use of interrogatory or document requests until further order of the court on good cause shown;

5) requiring the University to seek prior court approval before allowing any transfer of either the Persepolis Fortification Text Collection or the Chogha Mish Collection while these citation proceedings are pending in this Court.

Respectfully submitted,

/s/ Thomas A. Doyle

One of the Attorneys for The University of Chicago and its Division, The Oriental Institute

I.D. #28
Thomas A. Doyle
Hillary Krantz
BAKER & McKENZIE
130 East Randolph Drive
Chicago, Illinois 60601
(312) 861-8000

Lawrence W. Newman
Jacob M. Kaplan
BAKER & McKENZIE
805 Third Avenue
New York, New York 10022
(212) 891-3970

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(Eastern Division)

| | |
|---|---|
| JENNY RUBIN, et al. ) | |
| Plaintiff, ) | |
| ) | Case No.: 03-CV-9370 |
| ) | Judge Blanche M. Manning |
| THE ISLAMIC REPUBLIC OF IRAN, et al. ) | |
| ) | |
| Defendants ) | |

## AFFIDAVIT OF RAYMOND TINDEL

I, Raymond Tindel, declare the following facts under oath and under penalty of perjury:

1. I am the Registrar and Senior Curator of the Oriental Institute of The University of Chicago. I have been with the Oriental Institute since 1986.

2. The Oriental Institute is the leading center in the United States for the study of the archaeological and textual record of the development of civilizations in the Ancient Near East, generally treated as including Egypt, North Africa, Israel, Turkey, Syria, Lebanon, Jordan, Mesopotamia and Persia, which include modern day Iraq and Iran. The Institute has existed since 1919 and has occupied the same building, on the University of Chicago campus, since 1931.

3. I am personally familiar with the only two collections of material held by the Oriental Institute of the University of Chicago which involve any ownership claim or interest on the part of any person or entity related to the Republic of Iran, or to any person or entity that I could include in the phrase "agent of instrumentality" of the Republic of Iran (hereinafter collectively "Iran"). Those collections are well known within the Institute and the community of scholars that study Persia as (1) the Persepolis Fortification Texts; and (2) the Chogha Mish

Material. I am personally the custodian of the Chogha Mish Material, and I am personally familiar with both collections, with their special handling needs, with the security applied to them, and with their scholarly value.

4. The Chogha Mish Material refers to items recovered by excavation at a site in Iran, different from the site that gave rise to the Persepolis Fortification Texts.

5. The Chogha Mish collection includes cuneiform writings and clay fragments that have "seal impressions." These are mud-and-clay based items that appear to have served the same purpose as later day wax seals applied to various objects and bearing various impressions of significance, embedded into the seal that was created by the ball of wet, pliable mud or clay. Like wax, these hardened. Like hardened mud, they are subject to being crumbled back into dirt and dust if mishandled. The characters and very existence of the seals and cuneiform items are the tools of understanding ancient Persian civilization, language, and history.

6. The U.S. State Department previously advised the Institute that the Chogha Mish materials were the subject of litigation before the Iranian Assets Tribunal, and that the dispute ended with an obligation for the U.S. to return the materials, which the State Department would arrange. No instructions for the material have subsequently been received and the Institute holds them for further direction.

7. There is no complete inventory of these two collections and the items are not all numbered or otherwise identified. The Chogha Mish materials are held in a single location within the Institute's high security storage. Janitors and other such personnel have no keys for access, and only the highest members of administration may access the collection. There are no plans to make any transfer of any part of the materials other than to fulfill whatever instructions were to have been forthcoming from the State Department. *As custodian of this collection, I*

*represent that it will not be transferred while these proceedings are pending without further order of this court.*

8. The Chogha Mish collection is not displayed or made the subject of any commercial use or activity. It was held only for scholarly research and the only value or use seen by the Institute as appropriate for the collection is as a tool of scholarly research into the development of Near Eastern civilizations.

9. The Chogha Mish collection is kept separately from the Persepolis Fortification Texts, and one collection can be dealt with, independently of the other.

SWORN TO BEFORE ME and subscribed in my presence this ____ day of June, 2004.

______________________________
Raymond Tindel

SUBSCRIBED and SWORN to
before me this ___ day of June, 2004.

______________________________
Notary Public

CHIDMS1/413645.1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(Eastern Division)

| | |
|---|---|
| JENNY RUBIN, et al. ) | |
| Plaintiff, ) | |
| ) | Case No.: 03-CV-9370 |
| ) | Judge Blanche M. Manning |
| THE ISLAMIC REPUBLIC OF IRAN, et al. ) | |
| ) | |
| Defendants ) | |

### AFFIDAVIT OF MATTHEW W. STOLPER

I, Matthew Stolper, declare the following facts under oath and under penalty of perjury:

1. I am the John A. Wilson Professor of Oriental Studies at the Oriental Institute of The University of Chicago. I teach in the Department of Near Eastern Languages and Civilizations, and am a member of the Committee on the Ancient Mediterranean World. I have been with the Oriental Institute since 1980.

2. The Oriental Institute is the leading center in the United States for the study of the archaeological and textual record of the development of civilizations in the Ancient Near East, generally treated as including Egypt, North Africa, Israel, Turkey, Syria, Lebanon, Jordan, Mesopotamia and Persia (which include modern day Iraq and Iran). The Institute has existed since 1919 and continuously has occupied the same building on the University of Chicago campus, since 1931.

3. I am personally familiar with the only two collections of material held by the University of Chicago which involve any ownership claim or interest on the part of any Iranian person or entity, including the Republic of Iran, or any person or entity covered by the phrase "agent of instrumentality" of the Republic of Iran (hereinafter all collectively referred to as "Iran"). Within the Oriental Institute and within the community of scholars that study Persia, those collections are known as (1) the Persepolis Fortification Texts; and (2) the Chogha Mish

Material. I am personally the custodian of the Persepolis Fortification Texts and I am personally familiar with both collections, with their special handling needs, with the security currently applied to them, and with their scholarly value.

4. The Persepolis texts are not "texts" in a modern sense, in that they are not inscribed upon paper. The collection consists largely of very small clay tablets and even smaller fragments of clay tablets, which were inscribed with cuneiform writings in approximately 500 B.C. They are not stone and do not always break cleanly like stone. To the contrary, they were made by impressing the characters into the moist clay with a stylus; the clay was then allowed to dry and harden in the open air. They were not "fired" or baked in any kind of oven. Created over two thousand years ago from the simple drying of mud-like wet clay, they are now dry, hard, brittle, and always susceptible to being rendered meaningless rubble by mishandling or excessive handling.

5. The word tablet is misleading as to the average size of these items, which can be estimated at approximately only a few inches in length or width, and less than an inch in thickness, with a very large portion of the collection being clay fragments that are no larger than the size of the end of a human finger.

6. The cuneiform writing on the dry pieces sometimes must be examined with magnifying lenses. The writing records facts that elucidate the state of civilization in the Ancient World. Like a jigsaw puzzle, the meaning and significance of individual pieces, and the tiny writings on them, are often understood only when one tiny fragment is aligned with another piece which was originally part of a common larger tablet.

7. The tablets have incalculable scholarly research value as a collection. Collectively, they give insights into one of the most important parts of history, in one of the most

important parts of the world. They uniquely document administrative organization, administrative behavior, and administrative recording of the Achaemenid Persian Empire, which began with Cyrus the Great in 550 B.C. and ended with the conquest of Persia by Alexander the Great and the Greeks in 330 B.C. Most relate to the reign of Darius I, in the 50 year period around 500 B.C. They are also an unparalleled data-set for two ancient languages, Elamite and Old Iranian, and an unparalleled data-set for the art of Archaemenid Persian Empire, art that can only be understood in connection with the contents of the texts. There is no counterpart of equal significance regarding administrative behavior from the Roman world or from any Greek classical state.

8. The Persepolis Texts were recovered by archaeological excavations in 1933, the legitimacy and legality of which have never been questioned or doubted by either the Oriental Institute or any government of Iran. Iran was fully aware of, and was a participant in, the Institute's recovery and transfer of the materials to the United States, in 1936, for further study. At the Institute, they have been studied for decades by a variety of scholars.

9. The Institute has always held the Persepolis Texts in trust for ultimate return to the people of Iran, subject to the Institute's right to define, organize, and study the texts. Neither the Institute nor any Iranian entity has expressed any disagreement or claim over the manner or purpose of the Institute's holding, or over the ultimate return of the Persepolis texts to the Iranian National Museum of Iran and the Iranian Cultural Heritage Organization.

10. Portions of the Persepolis texts have been returned on three occasions to Iran. In 1948, 150 texts (tablet pieces) were returned to Iran for study. In 1951, although the collection size had been originally estimated at 30,000 pieces, some 37,000 fragments from the collection

were returned to Iran for its own study. In 2004, the Institute returned another approximately 300 pieces to Iran.

11. There are no transfers of the Persepolis Fortification Texts now planned or contemplated by the University for any time in the near future—at least for the next six months. *No transfer will be made of this collection without prior court approval during these pending proceedings.*

12. The first significant product of decades of research work on the Persepolis texts was not published until 1969, when Richard T. Hallock published materials that reflected the prior 30 years of study on only 2087 of the texts. Knowledge about the texts in the collection accumulates over time, and not in a simple, linear fashion. A breakthrough regarding one piece or group of pieces can change the prior understanding or significance of any number of other pieces. The total scholarly value of the collection is much greater than the sum of its parts precisely because of the interrelationships among the pieces.

13. Unknown thousands of pieces remain in the collection, subject to continuing study. That study, like that of the last seventy years, could take decades to complete.

14. The material must be handled carefully. It was originally shipped in paraffin that was then melted away upon arrival in the United States in the 1930's. Thousands of cigar-box sized containers have subsequently decayed and been replaced in many cases by new cardboard boxes, by plastic boxes, and by placement of fragments in large metal drawers in cabinets and on shelves which are kept within my personal office at the Institute. To date, although a portion of the collection, totaling approximately 4,500 pieces, have been labeled, numbered and shelved after being carefully cleaned, read and conserved, there still is no comprehensive classification system that currently provides a detailed inventory of the entire collection. The portions of the

collection that have not yet been classified require extensive curatorial work and study before any meaningful classification can be made. On more than one occasion, the Institute has declined to subject the collection to extensive movement and dangerous manipulation that would likely be involved in any expensive and time-consuming effort at total numbering or classification of the pieces. The handling of two-thousand-year-old dried clay should always be minimized, and the Institute has eschewed any unnecessary numbering or coding exercises that would not only deface the objects but also risk their very destruction.

15. The entire collection is kept under lock and key by me, as the person charged with overseeing the continuing research on the collection. My training, study and research provide me with specialized and highly developed knowledge not only of the historical, cultural and linguistic importance of the collection as a whole, but also of its physical properties and needs. The glass panes in my office door were removed and replaced with a windowless door with double locks approximately ten years ago as a security measure to preserve the collection. Janitors and other personnel who have keys to other areas in the Institute do not have a key to access this collection, as access is reserved to me (or a visiting scholar I can designate as needed), to one of my colleagues who is most active with this collection, and the Security Supervisor of the Institute. In addition to the locks on the office, the entire collection and the rest of the Institute's holdings are held in a heavily alarmed and secured facility that has stored this and other collections without incident for close to a century.

16. The value and uses of the material are entirely scholarly in nature. They are not the subject of any commercial use whatsoever. The Institute derives no revenue from their use or presence. They have no value of the kind that semi-precious stones have, and their only value to the University is their value as keys to the past.

17. I believe that any collector's concept of value for any of the pieces would be inimical to the value of the collected materials to a research institute that brings together experts in language, history, art, anthropology, and other disciplines to treat the material as a collection and to collectively study its significance and lessons for the study of civilizations. Detaching a single tablet from the group would vastly reduce its value for research purposes, and would, on the whole, add modern damage to the already significant ancient damage the collection has suffered.

18. I make these allegations on my own personal knowledge and in the case of paragraph 16 on my firm belief as a scholar, as well as under penalty of perjury.

- 7 -

Further your affiant sayeth not.

<div style="text-align: right;">_____<br>Matthew W. Stolper</div>

SUBSCRIBED and SWORN to
before me this ___ day of June, 2004.


_____
Notary Public

CHIDMS1/414181.1