IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JENNY RUBIN, DEBORAH RUBIN, )
DANIEL MILLER, ABRAHAM )
MENDELSON, STUART E HERSCH, )
RENAY FRYM, NOAM ROZENMAN, )
ELENA ROZENMAN, TZVI ROSENMAN, )
                          )
          Plaintiffs, )      No.  03 C 9370
     v. )
                          )      Judge Robert W. Gettleman
THE ISLAMIC REPUBLIC OF IRAN, THE )
IRANIAN MINISTRY OF INFORMATION AND )
SECURITY, AYATOLLAH ALI HOSEINI )
KHAMENEI, ALI AKBAR HASHEMI- )
RAFSANJANI, ALI FALLAHIAN-KHUZESTANI )
                          )
          Defendants. )
                          )
                          )
                          )
THE UNIVERSITY OF CHICAGO, THE FIELD )
MUSEUM OF NATURAL HISTORY, )
                          )
          Citation Respondents. )

## MEMORANDUM OPINION AND ORDER

In this action, plaintiffs seek to attach and execute on numerous ancient Persian artifacts

in the possession of the University of Chicago and the Field Museum of Natural History ("the

Museums") to satisfy a default judgment entered against the Islamic Republic of Iran ("Iran").[1]

Both the Museums and Iran (collectively, "defendants") have moved for summary judgment,

asserting that the artifacts are not subject to attachment under any of the statutes cited by

---

[1]Jurisdiction for the underlying action was predicated on the exceptions to sovereign
immunity detailed in 28 U.S.C. § 1605(a)(7).

plaintiffs. For the reasons described below, the defendants' motions for summary judgment are granted.

## BACKGROUND[2]

The facts of this case have been described in previous district court and appellate opinions, <u>see</u> <u>Rubin v. The Islamic Republic of Iran</u>, 637 F.3d 783, 786 (7th Cir. 2011),[3] and the court will not rehash those facts in detail here. In short, on September 4, 1997, Hamas carried out a horrific triple suicide bombing in Jerusalem that killed five individuals and wounded 200. Plaintiffs are American citizens who were either wounded or suffered severe emotional and loss-of-companionship injuries as a result of the attack. Plaintiffs sued Iran in the federal district court in Washington, D.C., alleging that Iran was responsible for the bombings as a result of the training and support it had provided to Hamas, and obtained a $71.5 million default judgment. Plaintiffs now seek to collect on that judgment by attaching alleged assets of Iran located within the United States. The assets relevant to this case are a number of collections of artifacts[4] currently in the possession of the Museums.

_____

[2]The following facts are, unless otherwise specified, undisputed and come from the parties' L.R. 56.1 statements.

[3]In 2011, the Museums appealed two orders by the district judge previously assigned to this case regarding discovery issues and the propriety of the assertion of an affirmative defense. <u>See</u> <u>Rubin v. The Islamic Republic of Iran</u>, 637 F.3d 783, 785 (7th Cir. 2011). That opinion dealt with these preliminary issues and remanded the case to the district court. The details of the opinion are discussed below.

[4]The court uses the terms "artifacts" and "collections" to describe all of the assets collectively. When an argument applies to a subset of those collections, the court will name the collection individually.

The Persepolis and Chogha Mish Collections are in the possession of the University of Chicago. Both belong to the National Museum of Iran and are on long-term loan to the University of Chicago's Oriental Institute ("the Institute") for scholarly study.

The Chogha Mish Collection consists of a small number of clay seal impressions recovered from excavations in Iran in the 1960s. Iran loaned the Chogha Mish Collection to the Institute for the purpose of academic study in the 1960s, and most of the collection was returned in 1970. In 1982, Iran informed the Institute that some items in the collection were missing. The Institute agreed to search for and return any inadvertently retained artifacts. In 1983, Iran filed a claim in the Iran-U.S. Claims Tribunal ("the Tribunal") seeking the return of the missing objects. Since the claim was filed, the Institute has located some of the missing objects, but has not returned those objects due to the citation entered in this case on May 20, 2004.[5]

The Persepolis Collection consists of approximately 30,000 clay tablets and fragments in the possession of the Institute. In 1937, Iran agreed to loan the Persepolis Collection to the Institute to be read and translated. The terms of the agreement allowed the Institute to retain 500 bricks upon completion of the deciphering operation, with the remaining 29,500 bricks to be returned to Iran. Over the years, Iran has made numerous inquiries into the timeline for the return of the bricks. Most recently, in 2004, the Institute entered into an agreement with Iran to return 300 tablets and to deliver the remainder to Iran "gradually and soon."

The Museums allege that the remaining artifacts of Iranian origin are the property of the Museums, while plaintiffs argue that they are the property of Iran. The Herzfeld Collection is a

---

[5]On May 20, 2004, plaintiffs issued a Citation to Discover Assets to the Museums. Because those artifacts are the subject of pending litigation, the Institute has not turned them over to Iran.

3

collection of roughly 1,200 prehistoric Persian artifacts purchased by the Field Museum in 1945 from Dr. Ernst Herzfeld, a German archeologist who worked in Persia from 1905 to 1936. The Field Museum purchased the collection in April 1945 for $7,300. The Field Museum subsequently sold part of the collection to the Institute in 1945, but took back six pieces in December 1946. Plaintiffs allege that Herzfeld is widely believed to have removed antiquities from Iran without the permission of Persian officials, and that he failed to provide evidence of his right to own and possess the items. Because of the lack of provenance of the items, plaintiffs argue that the Herzfeld Collection remains the property of Iran.

The remaining artifacts are small collections that the Museum defendants refer to collectively as "the OI collection."[6] The Institute states these items were acquired through a division of joint excavation finds with Iran or as gifts from third parties, and claims that the Institute owns the items. Plaintiffs claim that the items were improperly removed from Iran and remain Iranian property.

---

[6]Plaintiffs separately identify each of the small collections that make up the OI collection, including: the Gremliza Collection, the Adams Collection, the Cooper Collection, "Bronze Bands with Striding Griffins," the Alizadeh Collection, and Accession 3699. The Gremliza Collection came into the possession of the Institute in 1988 from a traveling medical doctor, Dr. Gremliza, who visited Iranian villages in the mid-1960s. Plaintiffs allege that Dr. Gremliza did not lawfully possess or own the items, and that he did not have permission to export them. The "Bronze Bands with Striding Griffins" are four sections of a bronze band that are part of the residual OI collection, and plaintiffs note that there are no records of how the items came into the possession of the Institute. The Adams Collection was acquired through Robert Adams, but plaintiffs assert that Adams did not own the items and that the Institute's evidence as to provenance is insufficient. The Cooper Collection was donated by Dr. Cooper, who found the items while stationed near Persepolis during World War II. Plaintiffs allege that Cooper's ownership of the collection is questionable. The Alizadeh Collection was given to the Institute in 1995 by a staffer, Abbas Alizadeh, who stated that he found them in a former staffer's home. Plaintiffs argue that the Institute has no records as to the ownership or authorizations by the staffer. Accession 3699 is a Persian tile "probably" given to the Institute by Otis Ellery Taylor. Plaintiffs argue that its chain of ownership is unknown.

Defendants have each moved for summary judgment, arguing that no legal mechanism exists that would permit the attachment of these antiquities. Iran seeks summary judgment with regard to the Persepolis Collection and the Chogha Mish Collection. The Museums seek summary judgment with respect to the Herzfeld Collection and the OI Collection. Specifically, defendants argue that there is no basis for plaintiffs to attach the artifacts under the exceptions to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., or the Terrorism Risk Prevention Act, 28 U.S.C. § 1610 note.

## DISCUSSION

**I.     Standard**

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Unterreiner v. Volkswagen of Am., Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum–Hill Assocs., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Green v. Carlson, 826 F.2d 647, 650 (7th Cir. 1987) ("[W]hen considering the qualified immunity issue on a motion for summary judgment, a district court should consider all of the undisputed evidence in the record, read in the light most favorable to the non-movant."); Fisher v. Transco Services–Milwaukee Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). The nonmoving party must, however, do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## II.     Foreign Sovereign Immunities Act

Both Iran and the Museums have moved for summary judgment on the ground that plaintiffs may not attach the artifacts under the FSIA. Under the FSIA, all "property in the United States of a foreign state shall be immune from attachment" unless exempted by an enumerated exception. 28 U.S.C. § 1609. All defendants argue that no exception to the FSIA applies to the collections, and thus no mechanism exists under the FSIA to attach the artifacts.[7] Plaintiffs bear the burden of demonstrating that the property is not immune from attachment. Rubin v. The Islamic Republic of Iran, 637 F.3d 783, 799 (7th Cir. 2011); Enahoro v. Abubakar, 408 F.3d 877, 882 (7th Cir. 2005).

_____

[7]The Museums argue that the Herzfeld and OI Collections are not the property of a foreign state, and that the FSIA therefore cannot serve as the basis for attachment. Because the question of commercial activity, discussed below, resolves the FSIA question for all the collections, the court need not reach the question of whether the items in the Herzfeld and OI Collections are the property of Iran.

### A.      Commercial Activity Exception

Plaintiffs argue that one of the enumerated exceptions to the FSIA detailed in Section 1610, the commercial activity exception, allows the attachment of the Persepolis Collection. Section 1610 provides that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment . . .."  28 U.S.C. § 1610(a).  Commercial activity is defined in Section 1603(d) as "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  Plaintiffs do not argue that Iran used any of the artifacts in a commercial manner to satisfy this exception; rather, plaintiffs contend that the Institute acts as Iran's agent, and therefore any commercial activity on the part of the Institute may properly be attributed to Iran.  The parties dispute whether: (1) the commercial use must be conducted solely by the sovereign to subject the artifacts to attachment; (2) whether the Institute may be characterized as Iran's agent and their actions therefore attributed to Iran; and (3) whether the acts performed by the Institute in the course of studying and displaying the artifacts constitute "commercial activity."

Section 1610 does not explicitly restrict the commercial activity exception to activity conducted solely by the sovereign.  For this reason, plaintiffs argue that the exemption should not be construed as limited to Iran's activities and may cover actions by the Museums.  Plaintiffs note that Section 1605 of the FSIA, which discusses the exceptions to jurisdictional immunity, contains a discussion of how a sovereign's commercial activities may subject it to the jurisdiction of U.S. courts.  Subsection (a)(2) of Section 1605 provides that a foreign state will

not be immune from jurisdiction in a case "in which the action is based upon a commercial activity carried on in the United States by the foreign state[.]" Because that subsection explicitly provides that the commercial activity must be carried on by the foreign state, plaintiffs argue that the drafters of the FSIA could have included that same explicit language in Section 1610, but chose not to do so. Therefore, as a matter of statutory construction, plaintiffs argue that the drafters must have intended not to restrict Section 1610 to activities carried on solely by the foreign state.

The court disagrees with plaintiffs' interpretation of the statute. First, Section 1603 defines a number of terms used throughout the FSIA. In Section 1603, a "commercial activity carried on in the United States by a foreign state" is defined as "commercial activity carried on by such state and having substantial contact with the United States." The defined term, therefore, does not simply refer to actions conducted only by the foreign nation, but contains the additional clause requiring that activity to have substantial contacts with the United States. The defined term does not require that the commercial activity actually take place within the borders of the United States, but rather that the activity have substantial contacts with the United States. In contrast, the language of Section 1610 provides that the property must be "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). An equally reasonable explanation for Congress' decision not to use the defined phrase in Section 1610 is to avoid expanding that Section to property used for a commercial activity having substantial contact with the United States. The drafters' exclusion of the phrase "carried on in the United States by a foreign state" is therefore not dispositive of an intention to broaden the scope of Section 1610 to actions conducted by other entities.

8

Further, Section 1602 of the FSIA articulates Congress' declaration of purpose in passing the Act. It states that "[u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. § 1602. A plain reading of that subsection demonstrates that it is the sovereign's commercial activities that subject the property to attachment.

Various courts have also examined the legislative history of the FSIA and determined that Congress intended Section 1610 to be limited to acts of the sovereign. See Rubin v. Islamic Republic of Iran, 456 F. Supp. 2d 228, 234 (D.Mass. 2006) (holding that the plain language, legislative history, and prevailing principles of international law compel the conclusion that the exception in Section 1610 should be interpreted to apply only where the sovereign itself conducts the activity); Connecticut Bank of Commerce v. Republic of Congo, 309 F.3d 240, 251–60 (5th Cir. 2002) (applying the principles of international law to the FSIA); DeLetelier v. Republic of Chile, 748 F.2d 790, 795–98 (2d Cir. 1984) (holding that FSIA's exceptions for executional immunity are narrower than its exceptions for jurisdictional immunity); Flatow v. Islamic Republic of Iran, 76 F. Supp. 2d 16, 21–24 (D.D.C. 1999) (holding that the Supreme Court's analysis of the FSIA in Republic of Argentina v. Weltover, 504 U.S. 607, 611-14 (1992), compels the conclusion that Congress intended Section 1610 to apply to the actions of the sovereign). This court agrees with the district courts that have interpreted Section 1610 to require action on the part of the sovereign for the commercial use exception to apply.

Plaintiffs further argue that a foreign state cannot conduct commercial activities on its own and must act through agents. With respect to the Persepolis Collection,[8] plaintiffs argue that the Institute is Iran's agent because the Institute has a fiduciary relationship with Iran and serves as bailee of Iran's property. As evidence of this alleged agency relationship, plaintiffs point to Iran's "working relationship" with the Institute, and equates that relationship to a fiduciary relationship. Plaintiffs also reference filings in this case where Iran has admitted to a bailor-bailee relationship with the Institute, and equate that relationship with an agency relationship. Plaintiffs argue that an agency relationship exists because the Institute must account to Iran for its activities, and that Iran has the right to exercise control over the Institute with regard to the artifacts.

Under Illinois law, a "principal-agent relationship is a legal concept founded upon a consensual and fiduciary relationship between two parties." Knapp v. Hill, 276 Ill. App. 3d 376, 380, 657 N.E.2d 1068, 1071 (1st Dist. 1995). The central question is "whether the principal had the right to control the activities of the agent." Id. Agents also owe duties of good faith, fidelity, and loyalty to the principal. ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc., 62 Ill. App. 3d 671, 20 Ill. Dec. 160, 379 N.E.2d 1228 (1st Dist. 1978).

Although the Institute and Iran have a "working relationship," the record does not demonstrate that the relationship is an agency relationship such that Iran controls the Institute. The relationship between the parties regarding the Persepolis Collection is set forth in a loan agreement between Iran and the Institute, and the terms of the relationship are governed by that

---

[8]Plaintiffs have abandoned their FSIA argument regarding the Chogha Mish Collection and do not argue that the commercial activity exception applies to the Museum Collections; therefore, the court will discuss only the Persepolis Collection.

agreement. Under the agreement, the Institute has possession of the Collection for the purposes of study and translation, and is obligated to return the Collection once it completes its studies. This relationship is not the equivalent of an agency relationship because Iran (the alleged principal) cannot control the activities of the Institute (the alleged agent) other than to obtain possession of the Collection when the Institute, in its judgment, is finished with its studies. The relationship is therefore more a bailment than an agency.

"Under Illinois law, bailment is the delivery of goods for some purpose, upon a contract, express or implied, that after the purpose has been fulfilled the goods shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept till he reclaims them." In re Mississippi Valley Livestock, Inc., _ F.3d _, 2014 WL 949969 (7th Cir. Mar. 12, 2014) (internal quotations and citations omitted). But a bailment is not equivalent to an agency relationship. Plaintiffs cite In Re Couthamel Potato Chip Co., 6 B.R. 501, 507 ( Bkr. E.D.Pa. 1980), wherein the bankruptcy court stated that bailment is a "true agency relationship." However, in the very next paragraph of that opinion, the court goes on to discuss the distinct definitions of a bailment and an agency, noting that they are not one and the same, but similar. Id. Indeed, although a bailee may be an agent of a bailor in certain circumstances, not every bailee is an agent. See Lionberger v. United States, 371 F.2d 831, 840 (Ct. Cl. 1967). Because a bailment relationship by itself does not give the bailor control of the bailee, the concepts and relationship are different than an agency. Id. (Noting that "[w]here the one who acts in another's behalf is not at the same time also subject to his control, then the relationship, though otherwise a bailment, is not also an agency."). The record does not demonstrate that the Institute had any duties above and beyond

the responsibilities articulated in the agreement with Iran, or that Iran directed the activities of the Institute such that the bailee relationship was elevated to an agency relationship.

It should also be noted that the Institute is conducting this academic study for its own research purposes, and not for Iran's benefit. Under the agreement, the Institute consented to provide to Iran "two copies of each of the works, review articles, collections of photographs or drawings it publishes based on the facts made known or the objects found during the work" at the Persepolis excavation, but the letter memorializing the agreement does not place further burdens or substantial conditions on the Institute.[9] There is no indication in the record that the Institute ever claimed more than a present possessory interest in the collection, or manifested anything other than an intention to work in its own interest. Plaintiffs' claim that the Institute is controlled by Iran are therefore unconvincing.

Because Section 1610 requires the commercial activity to be conducted by the sovereign, and there is no evidence that the Institute may properly be considered an agent of Iran, the court finds that the assets are not subject to attachment under Section 1610 of the FSIA.[10]

**B.      Section 1610(g)**

In 2008, Congress passed the National Defense Authorization Act ("NDAA"), Pub. L. No. 110-181, which, among other things, amended 28 U.S.C. § 1610 to add subsection (g). That section provides that:

---

[9]The record also includes letters from the Institute to Iran wherein the Institute promises to "a full account of our activities in behalf of [Iran]," and other assurances, but these documents do not grant Iran the power to direct the work of the Museums.

[10]Because the court finds that the commercial activity must be conducted by the sovereign, it need not reach the issue of whether the Museums' activities may be characterized as commercial activity.

(1) In general.--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

> (A) the level of economic control over the property by the government of the foreign state;
>
> (B) whether the profits of the property go to that government;
>
> (C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
>
> (D) whether that government is the sole beneficiary in interest of the property; or
>
> (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

Plaintiffs argue that the passage of this provision allows the execution against all terror states' assets, regardless of whether they are blocked assets. Plaintiffs rely heavily on In re Islamic Republic of Iran Terrorism Litigation, 659 F.Supp.2d 31, 62 (D.D.C. 2009) ("In re Terrorism Litigation"), in which Chief Judge Lamberth stated that the NDAA added "new provisions that are plainly intended to limit the application of foreign sovereign immunity."

Defendants argue that plaintiffs did not raise the applicability of Section 1610(g) in the previous appeal of this case to the Seventh Circuit, and are therefore precluded from arguing its applicability on summary judgement because of the mandate rule. They further argue that Section 1610(g) is not an independent exception to immunity, but rather was intended to aid in the execution against property regardless of whether the property belongs to a foreign sovereign or an agent or instrumentality of the sovereign. According to defendants, Congress passed this amendment to Section 1610 to counter the Supreme Court's ruling in First Nat'l City Bank v.

Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 627–28 (1983) ("Bancec"), which held that the separate juridical status of a foreign state's instrumentalities and agencies should be respected, and those entities should be accorded a presumption of independent status.

The mandate rule dictates that "any issue that could have been but was not raised on appeal is waived and thus not remanded." United States v. Chaidez, 2013 WL 3819658, at *3 (N.D. Ill. July 22, 2013). In 2009, Iran appealed two discovery-related orders by the district judge previously assigned to this case. The first order found that "the immunity codified in § 1609 is an affirmative defense personal to the foreign sovereign and must be specially pleaded[;]" the second order allowed discovery regarding all Iranian-owned assets located in the United States. Rubin v. The Islamic Republic of Iran, 637 F.3d 783, 785 (7th Cir. 2011). Defendants argue that plaintiffs should have raised the application of Section 1610(g) before the Seventh Circuit in that appeal when arguing that Iran's assets were not immune from attachment and that plaintiffs were therefore entitled to general asset discovery.

The court concludes that the mandate rule does not preclude plaintiffs from arguing the applicability of Section 1610(g). The Seventh Circuit's previous decision dealt narrowly with discovery-related issues and made no findings about whether any assets would be subject to attachment. At this early stage of the proceedings, the Seventh Circuit discussed the issue of "discovery in the context of attachment proceedings against foreign-state property in the United States under the FSIA," noting that courts must "proceed narrowly, in a manner that respects the statutory presumption of immunity." Id. at 796. The court made no specific findings about the potential basis for immunity or any exceptions that would limit plaintiffs' Section 1610(g) argument at this juncture.

However, plaintiffs' Section 1610(g) argument nonetheless fails. First, if Section 1610(g) provided a separate basis for attachment that allowed the execution against all terror states' assets, regardless of whether they are blocked assets, certain subsections of Section 1610 would be unnecessary. Subsection (a)(7) provides that when "the judgment relates to a claim for which the foreign stat e is not immune under section 1605A or section 1605(a)(7)," the property of the foreign state used for a commercial activity is not immune from attachment "regardless of whether the property is or was involved with the act upon which the claim is based." Similarly, subsection (b)(3) provides the same for agencies and instrumentalities of the foreign state. Essentially, under those subsections, plaintiffs who obtain judgments under Section 1605A may invoke the commercial activity exception. If Section 1610(g) simply allowed the attachment of all property whether used for commercial activity or not, then subsections (a)(7) and (b)(3) would be inconsistent, because they require a relation to commercial activity. It is the court's duty "to give effect, if possible, to every clause and word of a statute." <u>United States v. Menasche</u>, 348 U.S. 528, 538–539 (1955) (internal quotations and citations omitted). Plaintiffs' interpretation of Section 1610(g) is therefore inconsistent with that cannon of statutory interpretation. Additionally, plaintiffs have virtually no support for their contention that Section 1610(g) expands the bases for attachment. As the court noted in <u>In re Terrorism Litigation</u>, upon which plaintiffs rely heavily, acknowledge that the "implications of § 1610(g) are far from clear." 659 F.Supp.2d at 62.

The new subsection includes the key phrase that "the property of a foreign state . . .and the property of an agency or instrumentality of such a state . . . is subject to attachment in aid of execution, and execution, upon that judgment *as provided in this section*." 28 U.S.C. § 1610(g)

(emphasis added).  The plain language indicates that Section 1610(g) is not a separate basis of attachment, but rather qualifies the previous subsections.  In light of this reading, defendants' argument that Section 1610(g) was enacted to supercede <u>Bancec</u> is consistent with the construction of the statute.  As the United States points out in its Statement of Interest, subsections (A) through (E) of Section 1610(g) mirror the factors suggested in <u>Bancec</u> as determinative of whether an instrumentality of a foreign government functions as an alter ego of that government.  See <u>Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines</u>, 965 F.2d 1375, 1381 (5th Cir. 1992).  As other courts have held, the purpose of Section 1610(g) is to counteract the Supreme Court's decision in <u>Bancec</u>, and to allow execution against the assets of separate juridical entities regardless of the protections <u>Bancec</u> may have offered.  See <u>Estate of Heiser v. Islamic Republic of Iran</u>, 885 F. Supp. 2d 429, 442 (D.D.C. 2012) <u>aff'd sub nom.</u> <u>Heiser v. Islamic Republic of Iran</u>, 735 F.3d 934 (D.C. Cir. 2013).

The court therefore finds that Section 1610(g) does not provide a new basis for plaintiffs to attach the assets of Iran, and does not subject the collections in question to attachment and execution.

## III.  Attachment under the Terrorism Risk Insurance Act

Plaintiffs claim that Section 201 of the Terrorism Risk Insurance Act ("TRIA"), 28 U.S.C. § 1610 note, permits the attachment of all the Iranian artifacts in question.  Section 201 provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or

attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Plaintiffs argue that Iran is a "terrorist party" as defined in TRIA, and that plaintiffs obtained a judgment on a claim for which Iran was not immune under 28 U.S.C.§ 1605(a)(7). Plaintiffs further argue that the artifacts in question are "blocked assets" under TRIA, and therefore subject to attachment. Defendants dispute that the artifacts are "blocked assets."

Section 201(d)(2)(A) defines a "blocked asset" as any asset "seized or frozen by the United States under section 5(b) of the Trading with the Enemy Act or under sections 202 and 203 of the International Emergency Economic Powers Act." In 1979, President Carter's Executive Order 12170 ("EO 12170") froze all Iranian assets in the United States, including the collections in question. Defendants argue that the Algiers Accords[11] and the subsequent executive orders that implemented the Accords, including Executive Order 12281, 46 Fed. Reg. 7.923 (Jan. 19, 1981) ("EO 12281"), then unblocked the assets and that the assets remain unblocked. Plaintiffs contend that neither EO 12281 or the Accord unblocked the assets.

---

[11]The Algiers Accords, 20 I.L.M. 224, was an agreement between the U.S. and Iran signed on January 19, 1981. Under the Accords, "the United States agreed to "restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979," *ibid.,* and (with some exceptions) to "arrange, subject to the provisions of U.S. law applicable prior to November 14, 1979, for the transfer to Iran of all Iranian properties," *id.,* at 227. Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi, 556 U.S. 366, 370, 129 S. Ct. 1732, 1736, 173 L. Ed. 2d 511 (2009) (internal quotations and citations omitted). Subsequent to the signing of the Accords, President Regan lifted legal prohibitions against transactions involving Iranian property. See Exec. Orders Nos. 12277–12282, 3 CFR 105–113 (1981 Comp.); 31 CFR §§ 535.211–535.215 (1981).

EO 12281 mandated that "[a]ll persons subject to the jurisdiction of the United States in possession or control of properties . . . owned by Iran . . . transfer such properties[] as directed . . . by the Government of Iran." 1-101. EO 12281 and Algiers Accords unblocked most Iranian assets that existed in the U.S. at the time. See <u>Weinstein v. Islamic Rep. Of Iran</u>, 609 F.3d 43, 55 (2d Cir. 2010). Under Treasury Department regulations, some exceptions to EO 12281 allowed certain Iranian assets to remain blocked. The Treasury Department regulation defines the properties unblocked by EO 12281 as "all uncontested and non-contingent liabilities and property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities." 31 C.F.R. § 535.333(a). That regulation further states that a property interest is "contested only if the holder thereof reasonably believes that Iran does not have title or has only partial title to the asset." 31 C.F.R. § 535.333(c).

Because different facts apply to the ownership of each of the collections, and thus the "blocked" or "unblocked" status of the artifacts, the court will address them separately.

### A.     The Persepolis Collection and the Chogha Mish Collection

In their briefs, both Iran and the Institute agree that the Persepolis Collection and the Chogha Mish collection ultimately belong to Iran. Plaintiffs argue that the history of the Persepolis Collection has long been disputed, and that in a previous filing defendants had characterized Iran's interest in the objects as a "reversionary interest" only. According to plaintiffs, this characterization demonstrates a contest as to ownership, despite defendants' claims. Further, because Iran filed a claim in the Iran-U.S. Claims Tribunal against the United States 1983 regarding the objects missing from the Chogha Mish Collection, plaintiffs argue that ownership of that collection is also disputed.

Regarding the Persepolis Collection, the filing that plaintiffs cite containing the language about the reversionary interest is a motion for a protective order filed by the University of Chicago and the Institute in June 2004 in the instant case. Although the motion does state that the National Museum of Iran "has only a reversionary interest[,]" the motion goes on to explain that this reversionary interest is a "right to ultimate ownership and return." Plaintiffs attempt to argue that a reversionary interest leaves a party with only a portion of the title of the object, but they cite no cases demonstrating that granting a current possessory interest to the Museums divests Iran of its title. The Museums' assertion of a possessory interest is not equivalent to a claim that Iran does not own the collections. The terms of the academic loan require the Institute to return that collection to Iran after the academic study is complete. Thus, plaintiffs' argument that the Museums have disputed the ownership of the Persepolis Collection is without merit.

Regarding the Chogha Mish collection, defendants claim that there is no dispute as to the ownership of the collection. As an initial matter, the proceedings in the Tribunal are not between Iran and the Museums, but are instead between the United States and Iran. Any conflict between those parties does not presume an objection on the part of the possessing museum. As the government points out in its Statement of Interest, the Treasury department regulations implementing the Algiers Accords make it clear that for an asset to be "contested," the contest must be between Iran and the property holder. See also Rubin v. Islamic Republic of Iran, 709 F.3d 49, 56-58 (1st Cir. 2013). Further, the record confirms that ownership of the collection is not one of the issues in the claim before the Iran-U.S. Claims Tribunal. Iran's claim before the Tribunal focuses on returning the objects that were not turned over in 1970 with the rest of the

collection.  Ownership of the collection is not disputed, and therefore, the objects are not "blocked" assets under TRIA.

Plaintiffs further argue that Executive Order No. 13,599, 77 Fed. Reg. 6,659 (Feb. 5, 2012) ("EO 13,599") made the collections "blocked assets."  EO 13,599, however, does "not apply to property and interests in property of the Government of Iran that were blocked pursuant to Executive Order 12170 of November 14, 1979, and thereafter made subject to the transfer directives set forth in Executive Order 12281 of January 19, 1981, and implementing regulations thereunder."  Id. at 6,660.  Because this court has already found that the assets were blocked under EO 12170 and unblocked under EO12281, EO 13,599 does not apply to the collections and does not render the assets "blocked" under TRIA.

Because the assets in question are not "blocked" under TRIA, they are not subject to attachment by the plaintiffs under that statute.

### B.     The Museum Collections

The Museums argue that the Museum Collections are not subject to attachment under TRIA because the Museum Collections are not the assets of Iran and are not "blocked" assets. Regarding the second point, the Museums rely on EO 12281, the Order that unblocked "all uncontested and non-contingent liabilities and property interests" of Iran.  As noted above, property is contested "only if the holder thereof reasonably believes that Iran does not have title or has only partial title to the asset." 31 C.F.R. 535.333(c).  The Museums assert that Iran does not have title to the assets, but they cite the First Circuit's opinion in Rubin v. Islamic Republic of Iran, 709 F.3d 49, 57-58 (1st Cir. 1013), for the proposition that an asset cannot be considered blocked under TRIA unless Iran itself asserts a claim of ownership over it.  The Museums argue

that Iran has never asserted ownership of the Museum Collections, and therefore those collections are unblocked assets not subject to attachment.

Plaintiffs argue that the Museum Collections were not unblocked by EO 12281 because the artifacts were contested at the time of the order. According to plaintiffs, the lack of evidence of provenance demonstrates Iran's ownership interest in the antiquities, and ownership of the antiquities is contested. Further, plaintiffs state that Iran "always contests ownership of items taken without permission."

The record does not demonstrate that Iran has asserted any claim of ownership over the Museum Collections, despite plaintiffs' broad statement that Iran "always contests" the ownership of its antiquities removed from the country. Plaintiffs support this argument with a number of cases before British courts wherein Iran contested the removal of artifacts that it alleged had been improperly removed.[12] These cases and submissions do not, however, indicate that Iran has offered any claim of ownership over the Museum Collections at issue here. As a result, the record does not support plaintiff's argument that Iran has disputed the ownership of these particular collections.

Although plaintiffs correctly argue that the First Circuit's decision in Rubin v. Islamic Republic of Iran, 709 F.3d 49 (1st Cir. 2013), is not controlling, it is well-reasoned and persuasive. The First Circuit considered the submission of the United States Department of the Treasury's Office of Foreign Assets Control (OFAC), which cited and interpreted the language of

---

[12]For example, plaintiffs cite a letter from a British law firm on behalf of Iran to a London gallery regarding a number of items that the London gallery had advertised for sale. The letter states that those items were considered of historical interest, and as such, proper authorization was required before those items could be removed. The letter further states that it is the position of the law firm that ownership of those items remained with Iran.

EO 12281 and the Treasury regulations. Those regulations required a transfer of properties only "as directed ... by the Government of Iran." 46 Fed.Reg. at 7,923; 31 C.F.R. § 535.215(a). OFAC argued that this language applied to the rest of the regulations regarding the transfer of assets such that Iran must actively direct the transfer of an asset or assert ownership in order to render an asset contested. The First Circuit deferred to OFAC's interpretation of the regulations, finding that "an asset can be 'contested' for purposes of 31 C.F.R. § 535.333 only if Iran itself has claimed an interest in the asset." Rubin v. Islamic Republic of Iran, 709 F.3d at 57-58.

The court finds the reasoning of the First Circuit and the interpretation by OFAC compelling.[13] The language cited by OFAC demonstrates that EO 12281 and Treasury's implementing regulations intended that only assets contested by Iran, and not by third parties such as judgment creditors, would remain blocked and therefore subject to attachment. The court therefore holds that Iran itself must contest the ownership of the property in order to render an asset contested, and therefore blocked, under the TRIA. Because Iran has not claimed

---

[13]Plaintiffs urge the court not to rely on OFAC's interpretation because the U.S. is a litigant in any case interpreting the TRIA, and because an agency's interpretation should only be used when the regulation is ambiguous. Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871, 880, 178 L. Ed. 2d 716 (2011). Both parties' readings of the regulation are plausible and the court must therefore turn to the agency's interpretation of the regulation for guidance, unless that interpretation is "plainly erroneous or inconsistent with the regulation." Id. (internal citations and quotation marks omitted). Plaintiffs further argue that courts should not defer to the position the U.S. when that position is announced during litigation in which the U.S. is participating. However, as the First Circuit noted, "[t]he fact that blocked assets play an important role in the conduct of United States foreign policy may provide a further reason for deference to the views of the executive branch in this case." Rubin v. Islamic Republic of Iran, 709 F.3d 49, 57 (1st Cir. 2013) (citing Rep. of Austria v. Altmann, 541 U.S. 677, 701–02 (2004), and Estate of Heiser v. Islamic Rep. of Iran, 885 F.Supp.2d 429, 440–41 (D.D.C. 2012).

ownership of the antiquities in the Herzfeld Collection or the OI Collection, those assets are not contested or blocked, and therefore are not subject to attachment under TRIA.[14]

## CONCLUSION

The court recognizes the tragic circumstances that gave rise to the instant action, but finds that the law cited by plaintiffs does not offer the remedy they seek.

For the foregoing reasons, none of the statutes cited by plaintiffs provide a basis for the attachment and execution against any of the artifacts in the Persepolis, Chogha Mish, Herzfeld, or OI Collections. Consequently, the court grants defendants' motions for summary judgment.

**ENTER:** **March 27, 2014**

**Robert W. Gettleman**
**United States District Judge**

---

[14]In support of their argument that TRIA and the FSIA are applicable to the Herzfeld and OI Collections, plaintiffs contend that Iran owns the artifacts, not the Museums. Because the court has found that even if the artifacts were owned by Iran, the commercial activities exception would not apply and the artifacts do not qualify as "blocked" assets, it is unnecessary for the court to reach the question of ownership.